# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| ANTHONY M. BEYER, as Trustee of the Joseph and Florence Mandel Family Foundation – Michele M. and Lawrence R. Beyer Family Fund,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>ROBERT C. BEYER, as Trustee of the Joseph and Florence Mandel Family Foundation – Michele M. and Lawrence R. Beyer Family Fund,<br><br>　　　　　　Defendant,<br><br>and<br><br>DAVE YOST,<br>Ohio Attorney General,<br><br>　　　　　　Intervenor. | **Case No. 1:25-cv-00473**<br><br>**Judge**<br><br><br><br><br><br>**Demand for Jury Trial** |

## COMPLAINT

1.　　Trustee Anthony M. Beyer brings this action to protect more than $150M in assets held by the Joseph and Florence Mandel Family Foundation – Michele M. and Lawrence R. Beyer Family Fund (the "Family Foundation"), a 501(c)(3) charitable organization organized under Ohio law.

2.　　The Family Foundation is part of a larger foundation, which in 2018 merged separate foundations previously formed by Joseph, Morton ("Mort"), and Jack Mandel (together, "the Mandel brothers" and the "Mandel Foundation"). The Mandel brothers were raised in Cleveland, had deep ties to the city, and maintained a strong desire to give back to the community that shaped them.

3.      For decades, the Family Foundation and its related foundations have funded major hallmark Ohio institutions, including the Cleveland Clinic and Case Western Reserve University. For example, the Family Foundation specifically has contributed approximately $1.5 million to charities in Cleveland in the past three years, including, for example, approximately $375,000 to the Hebrew Academy of Cleveland, approximately $225,000 to the Friendship Circle of Cleveland, and $600,000 to various local arts and music programs, such as the Cleveland Uncommon Sound Project, the Heights Art Collaborative, and the Cleveland Ballet.

4.      The Family Foundation is governed by a set of regulations (the "Regulations"),[1] which structure the foundation to function as a charitable trust.  For example, the Regulations refer to the family members as "trustees" rather than directors, and their pay and distributions function just like any other charitable trust, as discussed in more detail herein.  The Family Foundation is a charitable trust under R.C. 109.23 and will thus be referred to as one throughout this Complaint.

5.      Since its inception, the Family Foundation has been ably administered by its Administrative Trustee, a sophisticated investment company called Parkwood Trust Company ("Parkwood"), which was handpicked by the Mandel brothers to safeguard the trust assets for the benefit of the trust's beneficiaries and various charitable causes.  The Mandel brothers created multiple other trusts and foundations (charitable and non-charitable), many of which are likewise administered by Parkwood.

6.      The Mandel brothers set up Parkwood to operate independently from—yet still involve—the Mandel brothers' families.  To achieve this balance, Parkwood's Board of Directors

---

[1]   Defendant, as co-trustee to the Family Foundation, has access to the Regulations and other relevant trust documents.  Because these trust documents contain confidential and sensitive information, Plaintiff has not attached them to the Complaint, but will seek leave to file them under seal at the appropriate time or upon request of the Court.

is comprised of, among others, between seven and nine independent directors (who cannot have a financial relationship with Parkwood or a family relationship with the Mandel brothers and their descendants), one to two directors from members of Joseph Mandel's family, and one to two directors from members of Mort Mandel's family. Parkwood's Board composition has stayed true to the Mandel brothers' wishes, with both family branches maintaining non-controlling representation on the Board. The Board has ably managed and faithfully followed the trust documents and executing strategy for long-term sustainability and growth, just as the Mandel brothers intended.

7.      That all changed in or around October 2019, when co-trustee Robert C. Beyer began orchestrating a scheme to seize control over trust assets. Shortly after the last of the original Mandel brothers died, Robert launched a targeted campaign to pressure and inappropriately influence Parkwood in an attempt to seize control over the trusts and assets that Parkwood managed. Robert's alternative vision was both reckless and contrary to the terms of the governing documents.

8.      Indeed, Robert wanted Parkwood to run the trusts like a quasi-hedge fund and pushed for the trust assets to be moved into riskier, shorter-term investments that could jeopardize the trusts' long-term viability. When Parkwood refused to deviate from its mandate to act as a deliberate steward of the generational trusts, Robert began bullying and harassing Parkwood staff, and demanded they take improper or unethical actions contrary to the trust's governing documents and purpose. After enduring several years of Robert's mistreatment, in May 2022, through the ordinary Board election process, Robert's seat on the Parkwood Board was not renewed.

9.      Enraged, insulted, and undeterred, Robert continued to rail against Parkwood and undermine it at every turn. Robert began to purposefully mislead family members to drive a wedge

between Parkwood and the family. Through his campaign, Robert deceived and manipulated several other co-trustees—including Michele Beyer (his mother) and Timothy Beyer (his younger brother)—into seeking to disengage Parkwood so that **Robert himself** could gain greater influence over the management of the trust assets and key investment decisions. Specifically, Robert convinced his mother and his brother to execute an invalid and procedurally improper resolution purporting to remove Parkwood as the administrator of the Family Foundation. He then sought to move trust assets to an unregulated company beholden to him rather than committed to the values and investment strategy outlined by the Mandel brothers and written into the trust's governing documents.

10.     Robert's actions are both inconsistent with the trust instruments and governing documents, and disloyal, as they threaten the Family Foundation's stability and ability to fulfill its charitable mission. His plan, if successful, would permit Robert to benefit himself at the expense of, or with reckless disregard for the interests of, the trust's intended beneficiaries. The trust's funding, much of which is dedicated to charitable causes in Ohio, as described above, would potentially be diverted to satisfy Robert's personal desire for short-term cash returns.

11.     As a co-trustee of the Family Foundation, Anthony now brings this action to enforce the terms of the Regulations, to uphold the original vision and intent of the Mandel brothers, and to protect the interests of the many organizations that benefit from the Family Foundation's support now at risk by Robert's reckless and self-interested actions.

## PARTIES

12.     Plaintiff Anthony M. Beyer is an individual residing in Palm Beach, Florida and is a citizen of Florida. Anthony is a trustee of the Family Foundation.

13.     Defendant Robert C. Beyer is an individual residing in New York, New York.  On information and belief, he is a citizen of New York.  Robert is Anthony's brother.  Robert is also a trustee of the Family Foundation.

14.     The Family Foundation is a 501(c)(3) charitable organization incorporated under the laws of Ohio with its principal place of administration in the State of Ohio.

15.     Intervenor Dave Yost is the Ohio Attorney General.  By reason of Section 109.25 of the Ohio Revised Code, Yost is a necessary party to this action, as an object of this proceeding is to construe the provisions of a charitable trust instrument.

<u>**JURISDICTION AND VENUE**</u>

16.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

17.     This Court has jurisdiction over Defendant Robert C. Beyer because Robert is a trustee of the Family Foundation, an Ohio organization, and directed his conduct at Ohio by targeting the Family Foundation to the detriment of the charitable beneficiaries residing in Ohio.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the conduct giving rise to Plaintiff's claims occurred in, and all or part of Plaintiff's claims for relief arose in, this District.

<u>**FACTUAL BACKGROUND**</u>

**I.      The Mandel Brothers' Success and Dedication to the Cleveland Community**

19.     In the summer of 1940, the Mandel brothers (Joseph, Mort, and Jack) pooled together $900 to purchase a small Cleveland auto parts business from their uncle.  This small investment became Premier Automotive Supply Company.  It was later renamed Premier Industrial

Corporation and would go on to become one of the world's leading industrial parts and electronic components distributors.

20.     Premier Industrial Corporation later listed on public exchanges and, by the late 1960s, was listed on the New York Stock Exchange.  It served over 100,000 customers across many countries.  In 1996, Premier merged with another company in a $3 billion transaction, becoming one of the largest industrial and electronic component suppliers in the world.

21.     The Mandel brothers' early commercial success allowed them to give back to the Cleveland community soon after starting the company, and their commitment to civic engagement and philanthropy would become a central tenet of their adult lives and legacy.  They began donating to charities in the late 1940s and established their first charitable foundation in 1963. Through their philanthropy, the Mandel brothers have left an indelible mark on Cleveland, contributing significant sums to local schools, hospitals, cultural institutions, and other non-profit organizations.  Among other institutions and causes, the Mandel brothers' philanthropy has supported Case Western Reserve University, Cleveland Clinic, Cleveland Museum of Natural History, Cleveland Public Library, Jewish Federation of Cleveland, and The Cleveland Orchestra. In 2022, the Morton L. Mandel CEO Chair and the Morton L. Mandel Innovation Fund were established with a $30 million grant to the Cleveland Clinic to support pioneering ideas in the medical field.

22.     Today, foundations created by the Mandel brothers, including the Family Foundation discussed in greater detail below, continue to provide funding for numerous non-profit education, arts, and Jewish organizations in Cleveland and elsewhere.

II.     **The Mandel Brothers Create a Series of Mandel Family Trusts and Create Parkwood to Prudently and Independently Manage Them**

23.     In the early 1960s, the Mandel brothers created an informal group to manage their families' investments, including their charitable foundations.  Over time, this informal group took on greater responsibility over the Mandel brothers' families' affairs, acting as a liaison between the Mandel family and their legal advisors and accounting and tax professionals and managing investments.

24.     In 1997, the Mandel brothers created **Parkwood LLC** as a more formal and professional organization to manage investments and services on behalf of the Mandel family. Parkwood LLC, operating out of Cleveland, was directed by Mort Mandel, who served as Chief Executive Officer and Chairman of the Board until his death in October 2019.  The purpose of Parkwood LLC is to serve as the family office of the Mandel family and its affiliated trusts and charities.  Today, it employs a staff of approximately 60 people in Cleveland and Delaware who are responsible for investment, accounting, tax, legal and estate planning services for Mandel family members (the beneficiaries of the private trusts) and also for their charitable entities.

25.     That same year, the Mandel brothers created the Parkwood Trust Company ("**Parkwood**"), a private Delaware trust company wholly owned by Parkwood LLC, to serve as a trustee in several of the Mandel Family Trusts.

26.     The Mandel brothers purposely set up Parkwood to operate independently from the family but to still incorporate the voices and perspectives of Mort's and Joseph's families; thus, certain members of the family serve on the Parkwood Board of Directors, including Plaintiff Anthony M. Beyer and until recently, Defendant Robert C. Beyer, in addition to several independent directors.  But even as the Mandel brothers gave family members a voice within Parkwood through limited Board representation, they also devised a longstanding anti-nepotism

policy to ensure that Parkwood remained independent of family influence. This careful balance struck by the Mandel brothers was purposeful and is a core pillar of their intent and vision for the government of the various family trusts they created.

27. In addition to Parkwood, the Mandel brothers created a series of Mandel Family Trusts to ensure their families' financial security and their philanthropic legacy. The Mandel trusts are categorized as either charitable corporations or private benefit trusts. One of each type of trust is relevant to this action, and Parkwood plays an important role in each—serving as administrative trustee for the charitable corporation and trustee for the private benefit trust, as outlined below.

28. To provide for his progeny, Joseph Mandel created a series of private trusts—collectively known as the **Grandchildren Trust**—comprised of individual private trusts for his grandchildren (including Anthony and Robert). Parkwood is the sole trustee for the private trusts contained within the Grandchildren Trust but is permitted under the trust instrument to disengage from that role for any beneficiary if it chooses to do so. If Parkwood elects to disengage, the Grandchildren Trust instrument instructs that the disengaged beneficiary must select a new trustee with Parkwood's consent. If Parkwood waives consent, the beneficiary must select as the new trustee a qualified institution. A qualified institution must have at least $10 billion in assets under management. The trust instrument gives the trustee absolute discretion regarding compensation, investment decisions, and trust management.

29. Separately, the Mandel brothers created the Joseph and Florence Mandel Family Foundation—Michele M. and Lawrence R. Beyer Family Fund ("the **Family Foundation**"), a 501(c)(3) nonprofit organization formed under the laws of Ohio. The Family Foundation is structured to function as a charitable trust. For example, Article I.A. instructs that the primary purpose of the foundation is charitable. Moreover, the regulations, specifically Article I.B. and

II.A., distinguish the Administrative Trustee from the Board of Trustees, much like a charitable trust would. Additionally, as explained in Article II.D, the trustees get paid out of their distribution, also like a charitable trust, and per Article III.A, III.B., and III.D.3.b, each trustee is responsible for a distribution, known as its "charitable fund," which must be used for charitable purposes, just as a charitable trust would.

30. In addition, the regulations are structured to provide family members with controlled autonomy in making charitable distributions in an amount equal to 5% of its assets on an annual basis. There are four trustees: Anthony, Robert, their brother Timothy, and their mother Michele. The Family Foundation has regulations setting forth its governance, which require annual and regular meetings, with special meetings callable by any two trustees with 14 days' notice. Action may be taken by a vote of the trustees at a meeting, and unanimous written consent is required to take action with no meeting. The Family Foundation is dedicated to benefitting the City of Cleveland, and, in many cases, communities beyond and has at times had representation on the Board of Directors of Parkwood.

31. Parkwood serves as Administrative Trustee for the Family Foundation and may only be removed from this role by a vote of all but one member of the Board of Trustees after a six-month cooling off period, during which time the trustees and Parkwood must attempt to resolve their differences. Under the regulations, if Parkwood is ultimately removed, any successor trustee must meet certain financial qualifications to constitute a "qualified institution," including having at least $10 billion in assets under management.

32. Under this framework, the Family Foundation's philanthropic giving has helped grow the Mandel brothers' lifetime impact to exceed $1 billion, benefitting programs and

organizations in the United States—with a focus on Cleveland—and Israel.  The Family Foundation has continued to successfully grow absent any internal turmoil until now.

### III.     Robert Is Removed from Parkwood's Board for the First Time

33.     As previously noted, the Mandel brothers initially gave several family members, including Robert C. Beyer, seats on Parkwood's Board to ensure that the family had a voice (but not control) over their trustee's activities.  The Board seats, however, were not guaranteed and a member could be removed (or not renewed) without cause.  This soon came to pass.

34.     In early 2019, while Mort Mandel was still Chief Executive Officer and Chairman of the Board of Parkwood LLC, Robert's behavior prompted Mort to remove Robert from Parkwood's Board of Directors.  Specifically, upon information and belief, Mort disapproved of Robert's continued attempts to inappropriately influence Parkwood staff and disrupt Parkwood's administration of the trusts.

35.     Upon information and belief, Mort thus reduced the number of family member seats in order to remove Robert's board seat from the Parkwood Board so that it was not burdened with a potentially disruptive family member.

### IV.     Mort Mandel Dies, and Robert Stages a Coup Against Parkwood

36.     Mort died on October 16, 2019.  During Mort's memorial service, Robert approached an independent Parkwood Board member, Scott Cowen, about the possibility of Robert returning to the Board.  A Board seat was re-added to allow Robert to rejoin the Board on a temporary basis.

37.     After Robert was re-appointed to the Board, he became increasingly focused on influencing the management of assets in trusts under the Grandchildren Trust of which he is the primary beneficiary.  Rather than working collaboratively within the carefully constructed trust

framework that intentionally did not allow family members to control or influence investment decisions, Robert sought to circumvent it for his exclusive benefit, disregarding the impact on other beneficiaries.

38.    Throughout his tenure on the Board, Robert attempted to influence Parkwood's management of its clients' investment assets.  But Robert was not a member of Parkwood's dedicated Investment Committee, which is responsible with providing strategic direction, risk management guidelines, and general oversight over Parkwood's management of its clients' investment assets.

39.    Parkwood investment staff generally declined to follow Robert's investment recommendations.  In response, Robert expressed dissatisfaction with and distrust of Parkwood's governance structure, directors, offices, employees, and investment approach.

40.    In May 2022, Robert's seat on the Board was up for renewal.  During Robert's evaluation for re-appointment, the Nominating and Governance Committee concluded that Robert had shown significant lapses in judgment, did not understand the boundaries of management and the Board, questioned the staff combatively, and had repeatedly violated Board policies— including most notably its confidentiality obligations.  Given this persistent behavior, Parkwood decided not to renew Robert's seat on the Board.

41.    Following the Board's decision, Robert's behavior worsened.  He began a campaign to undermine Parkwood, hiring legal counsel and positioning himself as the *de facto* leader of an effort to remove Parkwood as trustee, and influencing other members of the family (who were not involved in the day-to-day aspects of Parkwood's activities) to join him, including by making false and misleading statements about Parkwood and its management of the trusts.

42.     During the summer of 2022, Anthony—trusting Robert's story about Parkwood—sought information and updates from Robert regarding his legal strategy and efforts to remove Parkwood as trustee.  Robert, however, provided evasive and misleading responses.

43.     On October 18, 2022, the Boards of Parkwood LLC and Parkwood Trust Company voted to disengage from the private, individual trusts of which Robert is a beneficiary.  The votes were unanimous with one abstention on the Parkwood LLC Board.

44.     Although Parkwood could have made the disengagement effective immediately, it gave Robert six months to reconcile and make amends.  Yet Robert made no effort to repair his relationship with Parkwood; instead, he escalated his tactics by sharing his baseless complaints regarding Parkwood with additional members of the Mandel family.  By way of example, in December 2022, Robert distributed a confidential, 45-page presentation to several family members that outlined a targeted attack on Parkwood's governance and management practices based on false statements, misrepresentations, and half-truths.

45.     Robert not only declined to reconcile with Parkwood, but he also unreasonably and intentionally delayed the process of selecting an appropriate institution to serve as his new trustee—and continues to do so today.

46.     In the spring of 2023, Robert informed Parkwood that he intended to form an unregulated private family trust company ("PFTC") in Wyoming to serve as successor trustee of his private trusts.  Upon information and belief, Robert chose to create the PFTC in Wyoming because the jurisdiction allows the entity to be unregulated.  Parkwood did not consent to Robert's appointment of this trustee because Robert refused to confirm that there would be certain structural safeguards at the PFTC to protect the trust assets and beneficiaries.

47.     Robert continues to refuse to find a replacement.  As a result, Robert's portion of the Grandchildren Trust is effectively stuck in limbo.  Parkwood thus filed suit to establish a successor trustee for Robert's trusts (the "Delaware Litigation").  In response, Robert escalated the conflict to try to increase his leverage, threatening to bring counterclaims alleging bad faith and other baseless accusations, seeking to disenfranchise Parkwood entirely.

48.     The Delaware Litigation has taken over 14 months.  Upon information and belief, Robert is not seeking a resolution but is instead employing scorched-earth tactics in the litigation to force his will on all parties.

### V.     Robert Manipulates Family Members to Join His Cause

49.     Throughout 2023 and 2024, Robert increased pressure on other family members, including Michele and Timothy, using exaggerated and even false claims of Parkwood's alleged failures to convince them to join him in severing ties with Parkwood.

50.     For example, Robert represented to his family members that after Mort's death, the Parkwood Board more than doubled their own compensation.  According to Robert, the Board implemented a deferred compensation scheme in which their compensation grows when certain illiquid securities held by Parkwood reach set valuations, even if those valuations do not actually yield returns.  This could not be further from the truth: in reality, after Mort passed, the Board assumed his management and leadership responsibilities, and so compensation was modified to reflect their new roles and responsibilities; moreover, the new compensation structure was appropriately benchmarked against comparable organizations.

51.     As another example, Robert represented to his family that Parkwood did not give him a fair opportunity to pick a successor trustee following his disengagement.  This is not true. Robert also misrepresented to others, including his co-trustees, that he was removed from the

Board of Directors by Parkwood in retaliation because he raised objections and asked questions regarding Parkwood's investments and risk management.  In actuality, Robert's seat was not renewed because he had violated Board policies, asked staff members to do things they believed were improper or unethical, and otherwise harassed Parkwood staff.

52.     As yet another example, Robert represented to his family that Parkwood fired a different Board member, Stephen Weinberg (his uncle), for siding with Robert.  In fact, Stephen willingly recused himself from the Board after the issue was raised with him.  Upon information and belief, Robert made similar false and misleading representations that Parkwood fired its risk manager in an alleged attempt to dismantle its risk management infrastructure.  In reality, the former risk manager transitioned into a different role while continuing to perform the risk management function until a different Parkwood employee assumed that role.  Moreover, Parkwood brought in an external risk consultant to advise on the risk management function during this time.

53.     After months of hearing Robert spin tales about Parkwood, Anthony decided to ask his own questions—including of Parkwood Board members—to get to the bottom of the corruption and deceit that Robert purportedly was rooting out from the Parkwood entity.  What he discovered was shocking: Robert had been *lying* to drive a wedge between Parkwood and the family so that the family would agree to jettison Parkwood as trustee and financial advisor.  Anthony also learned that Robert's actions were part of a broader scheme to manipulate trust governance for his own influence and gain.  Anthony began to encourage his other family members to treat Robert's narrative with caution and to exercise their own independent decision-making before blindly following Robert's lead.  But it was too late: Robert had so thoroughly misled Michele and

Timothy that, rather than heed Anthony's warning, they chose instead to sever communications with Anthony.

**VI.  Robert Induces His Family to Violate the Family Foundation Regulations**

54.    Robert's years-long and relentless campaign against Parkwood succeeded in deceiving his co-trustees—his mother Michele and brother Timothy—and caused them to disengage from Parkwood.  Michele, Timothy, and the Family Foundation notified Parkwood of their disengagement on December 19, 2024, and, under Robert's influence, Michele and Timothy purportedly executed an *ultra vires* resolution ("the Invalid Resolution") alongside Robert claiming to officially remove Parkwood as Administrative Trustee to the Family Foundation on or about January 7, 2025.  The Invalid Resolution violates the Regulations in several critical respects.

55.    *First*, the Regulations expressly require that any action be taken by a "meeting of the Board of Trustees" or if "taken without such meeting[, be taken] by a writing or writings signed by ***all of the members*** of the Board."

56.    The Regulations also require that "[w]ritten notice of the time and place of each annual or special meeting of the Board of Trustees ***shall*** be given to each Trustee."

57.    Here, the Invalid Resolution was executed without Anthony's knowledge or consent—either through a meeting that he, as a trustee, was not given proper notice of, or through an action taken without a meeting that required his signature.

58.    *Second*, the Regulations unambiguously require that "[i]f the Board of Trustees of the Corporation decides . . . to remove Parkwood as Administrative Trustee, the Board of Trustees ***must first*** confer with Parkwood in an attempt to resolve any differences [for] a six (6) month period following the Board's delivery of written notice of its desire to remove Parkwood."

59.     In violation of the Regulations, the Invalid Resolution purports to "hereby remove[] [Parkwood] as the Administrative Trustee," without having provided any prior written notice to Parkwood of the Board's desire to remove Parkwood, much less an attempt to confer with Parkwood in an attempt to resolve differences for a 6-month period.

60.     *Third,* the Regulations expressly hold that if Parkwood is no longer the Administrative Trustee, "whether by resignation, removal, or otherwise," then "the successor Administrative Trustee ***shall be . . . [a] qualified institution*** as designated by a majority of the Board of Trustees."  A qualified institution is defined in turn as an "institution having a total capital and surplus of at least $1 billion and with fiduciary assets under management of more than $10 billion."  *Id.*

61.     Upon information and belief, Robert intends to designate the PFTC as the successor Administrative Trustee.  But at present, the PFTC ***does not exist, would not be regulated, and is not a "qualified institution"*** as defined in the Regulations.

62.     Judicial intervention is now required to prevent further violations of the Regulations and subversion of the Mandel brothers' intentions in creating their charitable trusts.  Robert has jeopardized the longevity and administration of the Family Foundation by disregarding the Family Foundation's established governance structure, prioritizing his own personal objectives over the interests of the charitable beneficiaries, misleading his co-trustees, willfully causing dissonance among the co-trustees, and failing to exercise proper care in decision-making.  His manipulation of family members, pressure on Parkwood employees, and disregard for fiduciary obligations demonstrate a clear pattern of misconduct that requires juridical intervention for the sake of the Family Foundation and its beneficiaries.

## FIRST CAUSE OF ACTION
### (Breach of Duty of Obedience to Trust Terms)

63.     Anthony realleges and incorporates the foregoing paragraphs of this Complaint as if fully written herein.

64.     As a trustee, Robert owes a duty of obedience to comply with the terms of the trust instrument to the Family Foundation and to administer the Family Foundation pursuant to its terms under R.C. 5808.01 and 5812.02, and other provisions of the Ohio Revised Code, and "shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries."

65.     Robert has breached his duty of obedience to comply with the express terms of the Regulations, as required of him as Trustee by the Ohio Trust Code and the Trust itself.

66.     The Family Foundation requires, among other things, that (1) any trustee action be taken by a "meeting of the Board of Trustees" or if "taken without such meeting[, be taken] by a writing or writings signed by *all of the members* of the Board," (the "Meeting Provision"),[2] and (2) "[w]ritten notice of the time and place of each annual or special meeting of the Board of Trustees shall be given to each Trustee," (the "Notice Provision").

67.     On or about January 7, 2025, under Robert's influence, a Family Foundation resolution purporting to be a legitimate Family Foundation resolution was signed by Robert, Timothy, and Michele, but not Anthony.  There was no "meeting of the Board of Trustees" or "[w]ritten notice of the time and place" provided to Anthony, as was required by the terms of the Meeting Provision and Notice Provision of the Regulations.  This Invalid Resolution was thus a breach of the Regulations.

---

[2]   Emphasis is added unless otherwise noted.

68.     On information and belief, Robert procured Michele and Timothy's signatures on the Invalid Resolution through false statements or reckless misrepresentations, including misrepresentations about Parkwood's actions and performance and Robert's ability to manage the Family Foundation on his own.

69.     The Regulations further require that "[i]f the Board of Trustees of the Corporation decides . . . to remove Parkwood as Administrative Trustee, the Board of Trustees must first confer with Parkwood in an attempt to resolve any differences [for] a six (6) month period following the Board's delivery of written notice of its desire to remove Parkwood," (the "Cooling Off Provision").

70.     The Invalid Resolution provided to Parkwood on or about January 7, 2025, purports to "hereby remove[] [Parkwood] as the Administrative Trustee," without having provided any prior written notice to Parkwood of the Board's desire to remove Parkwood.  Thus, Robert breached the Cooling Off Provision of the Regulations.

71.     Robert's actions constitute a violation of R.C. 5808.01 and 5812.02, and other provisions of the Ohio Revised Code.

72.     As a direct and proximate result of Robert's breach of his duty of obedience to the trust terms, the Family Foundation has sustained damages in excess of $75,000, the exact and total amount of which will be determined at or prior to trial.

73.     By reason of actual and justiciable controversy, the Family Foundation is entitled to declaratory relief pursuant to R.C. 2721.01, *et seq.*, 28 U.S.C. § 2201, and the Court's equitable powers, and the Court should enter an order declaring Robert's conduct, including and especially his attempt to appoint the PFTC as Administrative Trustee, is not allowed by the trust document, and he must instead choose a qualified entity.

## SECOND CAUSE OF ACTION
### (Breach of Duty of Loyalty)

74.     Anthony realleges and incorporates the foregoing paragraphs of this Complaint as if fully written herein.

75.     Robert owes a duty of loyalty to the Family Foundation under R.C. 5808.02 and other provisions of the Ohio Revised Code, and "shall administer the trust solely in the interests of the beneficiaries."

76.     Robert has breached his duty of loyalty, as required of him as a trustee.

77.     Robert's actions have created a conflict between his own interests and those of the Family Foundation.

78.     Robert's unregulated Wyoming entity, the PFTC, was raised in the litigation between Parkwood and Robert in Delaware Chancery Court.  Parkwood alleges it could not consent to Robert's request to designate the PFTC as trustee, because, among other things, Robert refused to confirm certain aspects about the proposed structure of the PFTC to ensure certain safeguards will be in place to protect the trust assets and beneficiaries.

79.     Upon information and belief, Robert is using the threat of removing Parkwood as the Administrative Trustee of the Family Fund either (i) as leverage to pressure Parkwood into consenting to transferring the Grandchildren Trust assets to the PFTC, which would give him unfettered access to his private trust funds in contravention of the terms of his private trust instrument or (ii) to gain further control over the assets of the Family Foundation in addition to the Grandchildren Trust assets.  Either of these scenarios is dangerous and, at minimum, demonstrates a conflict of interest in his role as trustee of the Family Foundation.

80.     Robert's conflicted position is underscored by his demand that Parkwood transfer to the PFTC certain illiquid assets held by Robert's private trust only after liquidation of these

illiquid assets, which would necessarily result in losses that would need to be absorbed by Parkwood and the other funds Parkwood manages (including the Family Foundation).

81. Moreover, misleading his co-trustees and willfully causing dissonance among them so that they cannot carry out their duties as trustees of the Family Foundation—in order to exert his will over Parkwood and the trust assets—is disloyal to the Family Foundation.

82. Further, Robert's attempt to move the Family Foundation to the unregulated PFTC is a transparent effort to benefit himself at the expense of the beneficiaries of the Family Foundation, including numerous charities and non-profit entities in Cleveland.

83. Additionally, Robert's successor trustee selection constitutes self-dealing: if the Family Foundation funds are transferred to the unregulated entity in Wyoming, the Family Foundation will lose the benefits of the size, sophistication, institutional knowledge, and—most importantly—short- and long-term protection of Parkwood's investment apparatus.

84. Robert's actions constitute a violation of R.C. 5808.01 and 5808.02, and other provisions of the Ohio Revised Code.

85. As a direct and proximate result of Robert's breach of his duty of loyalty to the Family Foundation, the Family Foundation has sustained damages in excess of $75,000, the exact and total amount of which will be determined at or prior to trial.

86. By reason of actual and justiciable controversy, the Foundation is entitled to declaratory relief pursuant to R.C. 2721.01, *et seq.*, 28 U.S.C. § 2201, and the Court's equitable powers, and the Court should enter an order declaring Robert's conduct, including and especially his attempt to appoint the PFTC as Administrative Trustee, is not allowed by the trust document, and he must instead choose a qualified entity.

## THIRD CAUSE OF ACTION
### (Breach of Duty of Care and Prudence)

87.     Anthony realleges and incorporates the foregoing paragraphs of this Complaint as if fully written herein.

88.     Robert owes a duty of care and prudence to the Family Foundation under R.C. 5808.01 and 5808.04, and other provisions of the Ohio Revised Code, and "shall administer the trust as a prudent person would and shall consider the purposes, terms, distributional requirements, and other circumstances of the trust."

89.     Robert has breached his duty of care and prudence, as required of him as Trustee by the Ohio Trust Code and the Trust itself.

90.     Robert's attempt to abscond with the Family Foundation's assets to an unregulated Wyoming entity that he controls without appropriate protections or investment expertise is not prudent and will significantly increase the risk to the trust property.  And Robert's means of carrying out his will (by misleading his co-trustees and breaching the trust documents) constitute breaches of his fiduciary duty as a trustee.  Robert's unacceptable actions have placed reasonable income and preservation of capital for the Family Foundation in serious jeopardy.

91.     The PFTC does not manage the amount of funds needed to attract the caliber of investment professionals Parkwood employs and is an untested venture that is inherently risky due to its lack of experience and investment expertise.  Upon information and belief, the PFTC does not exist yet (and does not even have written bylaws in place).

92.     Robert's ongoing attempt to move the entire Family Foundation puts the funds in the Family Foundation at serious risk.

93.     Robert's actions constitute a violation of R.C. 5808.01 and 5808.04 of the Ohio Trust Code and other provisions of the Ohio Revised Code.

94.     As a direct and proximate result of Robert's breach of his duty of care and prudence to the Family Foundation, the Family Foundation has sustained damages in excess of $75,000, the exact and total amount of which will be determined at or prior to trial.

95.     By reason of actual and justiciable controversy, the Family Foundation is entitled to declaratory relief pursuant to R.C. 2721.01, *et seq.*, 28 U.S.C. § 2201, and the Court's equitable powers, and the Court should enter an order declaring Robert's conduct, including and especially his attempt to appoint the PFTC as Administrative Trustee, is not allowed by the trust document, and he must instead choose a qualified entity.

### FOURTH CAUSE OF ACTION
### (Removal of Trustee - R.C. 5807.06)

96.     Anthony realleges and incorporates the foregoing paragraphs of this Complaint as if fully written herein.

97.     The Court may remove a trustee if the trustee has committed a serious breach of the trust, if there has been a lack of cooperation which substantially impairs the administration of the trust, or because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively that best serves the interests of the beneficiaries as provided in R.C. 5807.06.

98.     Robert has committed a serious breach of trust by intentionally failing to follow the terms of the Regulations, including Meeting and Notice Provisions, in order to induce his co-trustees to buy into his scheme to lure them away from Parkwood and towards his PFTC.

99.     Robert has committed a serious breach of trust by knowingly making false and exceedingly misleading statements to his co-trustees in order to induce them to buy into his scheme to lure them away from Parkwood and towards his PFTC.

100.    Robert has demonstrated an unfitness, unwillingness, and persistent failure as to administer the trust effectively and in accordance with the intent of the settlors.

101.     Robert has breached numerous fiduciary duties as trustee of the Family Foundation, including to protect the trust assets, loyalty, due care and prudence, and manage the trust in a way that benefits the beneficiaries.

102.     Pursuant to R.C. 5807.06, the Court should order the removal of Robert as Trustee of the Family Foundation.

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment)

103.     Anthony realleges and incorporates the foregoing paragraphs of this Complaint as if fully written herein.

104.     Anthony seeks declaratory judgment pursuant to R.C. 2721.01, *et seq.*, 28 U.S.C. § 2201, and the Court's equitable powers, that Robert's conduct, including and especially his attempt to appoint the PFTC as administrative trustee, is not allowed by the trust document, and he must instead choose a qualified entity.

105.     A real and justiciable controversy exists between Anthony and Robert as to each party's respective rights and obligations regarding the administration and management of the Family Foundation.

106.     Speedy and effective relief is necessary to preserve the rights of the Family Foundation and Anthony, as Trustee of the Family Foundation, and a declaratory judgment will resolve the dispute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendant Robert C. Breyer, and:

      a.    Enter an order declaring Robert's conduct, including and especially his attempt to appoint the PFTC as Administrative Trustee, is prohibited by the

trust document, and he must instead choose a qualified entity as that term is defined by the trust document;

b.    Enter an order declaring the PFTC is not a qualified entity under the trust documents;

c.    Enter an order removing Robert as Board of Trustees of the Family Foundation as a trustee for:

    (i)    committing a serious breach of trust by breaching the trust documents;

    (ii)    failing to protect the trust assets by attempting to move them to an unregulated Wyoming entity;

    (iii)    attempting to improperly influence and mislead other trustees; and

    (iv)    refusing to cooperate among the co-trustees in ways that do not serve the interest of the beneficiaries;

d.    Award damages and costs against Defendant Robert C. Beyer, including compensatory and any available exemplary or punitive damages, in an amount to be determined at or prior to trial in no event less than $75,000 exclusive of applicable interest, costs and attorneys' fees, all of which continue to accrue;

e.    Award pre- and post-judgment interest on any and all damages;

f.    Award Plaintiff his costs, including his reasonable attorneys' fees and litigation expenses, pursuant to R.C. 2721.16 and 5810.01; and

g.    Order such other, further, and general relief as is just and proper.

Respectfully submitted,

Dated:   March 10, 2025

   s/ Matthew J. Cavanagh
Matthew J. Cavanagh (OH 0079522)
McDonald Hopkins LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474
mcavanagh@mcdonaldhopkins.com

and

**KIRKLAND & ELLIS LLP**
Mark Premo-Hopkins, P.C.*
Britt Cramer, P.C.*
Jenna Stupar*
mark.premohopkins@kirkland.com
britt.cramer@kirkland.com
jenna.stupar@kirkland.com
* *Pro hac vice* applications forthcoming

*Attorneys for Plaintiff,*
*Anthony M. Beyer*

## JURY DEMAND

Pursuant to Civ. R. 38, Plaintiff hereby demands a trial by jury on all issues and claims so triable.


  s/ Matthew J. Cavanagh
*Counsel for Plaintiff Anthony Beyer*